UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

---

| | |
|---|---|
| SHERRIE L. STUMP | CIVIL ACTION NO. 13-3053 |
| VERSUS | JUDGE ELIZABETH ERNY FOOTE |
| CITY OF SHREVEPORT | MAGISTRATE JUDGE HORNSBY |

---

### MEMORANDUM RULING

Pending before the Court is a Motion for Summary Judgment submitted by the Defendant, the City of Shreveport, which prays for this Court to dismiss all of the claims brought against it by the Plaintiff, Sherrie Stump. Upon consideration of the briefs filed by the parties and for the reasons stated below, the Court hereby **GRANTS in part** and **DENIES in part** the Defendant's motion. [Record Document 13].

I.    **The Factual and Procedural Background**

The Plaintiff's case concerns her employment with the Shreveport Police Department ("SPD") and the alleged acts of discrimination she suffered while employed there. The Plaintiff began her employment in 2006 and was transferred to the Crime Scene Investigation Unit ("CSIU") in May 2010. Record Document 18, p. 2.[1] The Plaintiff, a female, was a corporal at the time of the purported discrimination, and her supervisors were all male–in particular, Sergeant Danny Duddy ("Duddy"), who was her supervisor throughout her tenure with the CSIU. Record Document 1, pp. 2-3.

The Plaintiff alleges that during her time with the CSIU, Duddy inappropriately

---

[1] As a member of the CSIU, a speciality unit within the SPD, the Plaintiff was responsible for responding to crime scenes and processing evidence.

discriminated against her because of her sex and treated male CSIU officers more favorably. Among other things, she claims that male officers were allowed to shop while on duty, leave early and arrive late, run errands, and take extended lunch breaks without their "comp time" being impacted, whereas female officers were charged this comp time if they missed work for any reason. Id. at pp. 3-4. Moreover, while the Plaintiff alleges that "Duddy refused to force male members of the CSIU to perform regular duties," he insisted "female officers perform the duties" and treated the Plaintiff differently. Id. at p. 4. Specifically, the Plaintiff asserts that she was placed on call contrary to the schedule, required to process vehicles for cases that were assigned to male officers, held to a higher standard, spoken to in a derogatory manner, and generally treated differently than the male officers. Id. at pp. 4-6. The Plaintiff also claims that on October 12, 2012, Duddy instructed her that she had to work at the Louisiana Tech University football game the following day, even though she had not signed up for the game and no male officer in CSIU was directed to work the game who had not signed up to do so. Id. at pp. 5-6.

In addition to complaining to Lieutenant Breck Bickham about Duddy's actions, the Plaintiff advised Captain Lee of the perceived discrimination within CSIU. Id. at pp. 3-5. A meeting was convened in April 2011 as a result of the Plaintiff's allegations, but she claims that there was no marked improvement afterward. Id. Rather, she asserts that "Duddy told [her] that he had been easy on her in the past and he began to further harass and discriminate against her on a regular basis." Id. at p. 5.

The Plaintiff's principal claim concerns a purported testing requirement for continued employment within the CSIU. According to the Plaintiff, she and two other female officers in the unit registered to take the International Association for Identification Crime Scene

Certification exam ("IAI exam") in Fall 2012, even though it was not mandated by any written directive at the time. Id. at p. 6.[2] After the Plaintiff and another female officer–Corporal Tracy Mendels ("Mendels")–failed the exam, Duddy pushed the Plaintiff and Mendels to retake the test. When they agreed, Duddy informed them that they would be removed from the CSIU if they failed again. Id. at p. 7. Although the Plaintiff filed a written request on January 4, 2013, to postpone her second test so that she could more adequately prepare for it, the Defendant refused to allow the Plaintiff to withdraw or delay the test. Id. The Plaintiff purports that at the time, "[a]t least 3 former male members of CSIU had failed this test and none were required to transfer out of CSIU as a result of their failing this test." Id. at pp. 7-8. Furthermore, she claims that no male member of the unit was required "to even apply to take the test" when she was forced to retake it. Id.

The Plaintiff failed her second exam, and on May 3, 2013, she was informed that she was being transferred out of the CSIU for this reason. Id. at p. 8.[3] The Plaintiff was then transferred to the patrol division and was assigned to the "graveyard shift," causing her a great deal of hardship as she is a single mother of two children. Id. She also claims that during this period, the Defendant assigned at least two male officers who were transferred out of speciality units, like the CSIU, to the day shift for patrol. Id. At pp. 8-9.[4] Furthermore, on May 24, 2013, Duddy completed the Plaintiff's annual evaluation in which

---

[2] In anticipation of the exam, she alleges that the Defendant failed to purchase or provide the female officers with adequate study materials, refused to allow them time at work to study, and only allowed them to attend two days of a five-day preparation course. Record Document 1, pp. 6-7.

[3] The Plaintiff submits that on the "day before [she] was transferred, her captain advised members of the CSIU that the test would be required from now on. However the male members of CSI were not scheduled to take the test prior to her transfer." Record Document 1, p. 10.

[4] The Plaintiff also alleges her belief that there were available positions on the day shift that she could have been assigned, but the Defendant refused to do so. Record Document 1, pp. 8-9.

he stated that she not only failed the IAI exam but that she regularly called in late for work, resulting in a "negative reliability rating." Id. at p. 9. The Plaintiff responded to this evaluation, in accordance with SPD policies, and disputed Duddy's assertions about her attendance and negative reliability. Id.

When the Plaintiff's former position within the CSIU was advertised, she reapplied for the position–despite the discrimination she suffered–and scored higher than any other applicant. Id. at pp. 9-10. Because only three applicants initially applied for the position, Duddy received approval from Chief Willie Shaw ("Chief Shaw") to readvertise the Plaintiff's vacated position. See Record Document 13, pp. 11-12. The Plaintiff had the highest score among the five new applicants, but after Duddy sent the scores up the chain of command, the applicant with the second highest score–a female–was selected because the Plaintiff "had previously failed the certification examination on two (2) occasions." Id. at pp. 11-12. The Plaintiff was never reassigned to the CSIU.

While these alleged acts of discrimination were taking place, the Plaintiff filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") regarding the Defendant's actions. This complaint was lodged after her written request to postpone her second IAI exam on January 11, 2013, and she later sent two letters supplementing this initial complaint to Chief Shaw on May 3 and June 21, 2013, wherein she alleged additional discriminatory actions. Record Document 1, p. 2. On August 20, 2013, the Plaintiff was issued her right-to-sue letter by the EEOC, and the present suit followed on November 12, 2013. Id.

The Plaintiff asserts that the actions of the Defendant violated Title VII of the Civil Rights Act ("Title VII"), the Louisiana Employment Discrimination Law, and Louisiana tort

Page 4 of 35

law–specifically, the intentional infliction of emotional distress. Id. at p. 12. The Plaintiff prays for monetary relief, injunctive relief, and a declaratory judgment that the Defendant's actions violated the Plaintiff's rights under Title VII. Id. In light of her claims, the Defendant filed its Motion for Summary Judgment. See Record Document 13.

## II.   Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004).

Although "the party moving for summary judgment must 'demonstrate the absence of a genuine issue of material fact,' [that movant] need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (emphasis in original) (quoting Celotex, 477 U.S. at 323). If the movant fails to satisfy this burden, however, then the motion should be denied. Id. When the movant does satisfy this initial burden, the nonmovant must demonstrate that there is, in fact, a genuine factual issue for dispute at trial by going "beyond the pleadings" and articulating the necessary factual support. Id.

"A dispute as to a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Boudreaux v. Swift Transp. Co., 402

F.3d 536, 540 (5th Cir. 2005). Nevertheless, while the nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt, or a scintilla of evidence, factual controversies should be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075; see Cooper Tire & Rubber Co. v. Farese, 423 F.3d 446, 456 (5th Cir. 2005).

## III.   Law and Analysis

### A.   The Plaintiff's Title VII Claims[5]

Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "The Title VII inquiry is whether the defendant intentionally discriminated against the plaintiff." Alvarado v. Tex. Rangers, 492 F.3d 605, 611 (5th Cir. 2007) (quoting Roberson v. Alltel Info. Servs., 373 F.3d 647, 651 (5th Cir. 2004)) (internal quotation marks omitted).

As an initial matter, the Court must address the Defendant's contention that certain allegations by the Plaintiff are time barred—especially those acts that took place before July 2012—because Title VII requires a plaintiff to file an action with the EEOC within 180 days

---

[5] In addition to her federal claims under Title VII, the Plaintiff also alleges the analogous state law claims under the Louisiana Employment Discrimination Law. La. Rev. Stat. §§ 23:301, 332. When brought in conjunction with Title VII claims, courts are permitted to use federal jurisprudence for guidance in analyzing these state law claims. See McCoy v. City of Shreveport, 492 F.3d 551, 556 n.4 (5th Cir. 2007) ("Louisiana's anti-discrimination statute . . . is 'substantively similar' to Title VII, and Louisiana courts routinely look to the federal jurisprudence for guidance. Consequently, the outcome of [a plaintiff's] statutory discrimination and retaliation claims will be the same under the federal and state statutes." (citation omitted)). As such, the Court's decisions below regarding the Plaintiff's Title VII claims apply with equal force and effect to her claims under Louisiana employment law.

of "the alleged unlawful employment practice." <u>See</u> 42 U.S.C. § 2000e-5(e)(1).  After examining the Plaintiff's EEOC complaint, it appears that she sought to cross-file her complaint with the Louisiana Commission on Human Rights ("LCHR"), which would extend the filing period to 300 days if done successfully.[6] The Court most note, though, that there is a noticeable lack of dates for many of the early allegations of discrimination and harassment that the Plaintiff suffered in the years and months leading up to her EEOC complaint. As a result, it is difficult for the Court to determine accurately whether these claims fall within the filing period for her EEOC complaint.[7] Despite this, the Plaintiff asserts that these early allegations are not time barred because the "continuing violation theory" relieves her of "establishing that all of the complained-of conduct occurred within the actionable period if [she] can show a series of related acts, one or more of which falls within the limitations period." Record Document 18, p. 19 (quoting <u>Huckabay v. Moore</u>, 142 F.3d 233, 239 (5th Cir. 1998)).

The Court declines to analyze the application of this theory to the case. Even assuming the continuing violation theory does apply, as explained below, the Plaintiff's claims that would otherwise be saved under this doctrine are subject to dismissal on the merits because the Plaintiff has failed to rebut the nondiscriminatory justifications offered

---

[6] In spite of the Court's best efforts to divine an answer from the parties' briefs and exhibits on the matter, it is unclear if the Plaintiff's EEOC complaint was ever actually cross-filed with the LCHR. Even though the Plaintiff's EEOC "Charge of Discrimination" contains a typed section that indicates that a charge should be prepared to the "Louisiana Commission on Human Rights and EEOC," the Plaintiff failed to check the box for that preparation. In fact, while the form has a charge number written in by hand for the EEOC, it does not have an agency "charge number" for the LCHR. <u>See</u> Record Document 13-1.

[7] The Court notes that the Plaintiff's EEOC complaint contains a few more dates that may permit further analysis of this timing issue. However, as explained below, the Court will instead address these claims on their merits.

by the Defendant for these actions. See Parts III.A.ii; III.A.iii.[8]

### i.     Hostile Work Environment

As part of her Title VII claims, the Plaintiff alleges that the "sexual discrimination and harassment inflicted by Sgt. Duddy was so severe and/or pervasive" that her work environment was "hostile and interfered with her conditions of employment and her work performance." Record Document 1, p.11. The Defendant counters that this claim is lacking for two reasons: First, the Plaintiff failed to exhaust her administrative remedies before filing suit. Second, even considering the merits of her claim, the Plaintiff failed to establish that the alleged incidents actually affected a term, condition, or privilege of her employment. The Defendant's arguments will be addressed in turn.

### a.     Exhaustion of Administrative Remedies

As a threshold matter, a plaintiff must exhaust his or her administrative remedies before bringing a hostile work environment claim under Title VII. See McClain v. Lufkin Indus., Inc., 519 F.3d 264, 273 (5th Cir. 2008). "Ordinarily, an employee may not base a Title VII claim on an action that was not previously asserted in a formal charge of discrimination to the EEOC, or that could not 'reasonably be expected to grow out of the charge of discrimination.'" Filer v. Donley, 690 F.3d 643, 647 (5th Cir. 2012) (quoting Pacheco v. Mineta, 448 F.3d 783, 789 (5th Cir. 2006)). Determining when a claim has been raised–and thus exhausted–in this context is a "fact-intensive analysis" that "looks beyond the four corners of the document to its substance." Id. Because claims for sex discrimination, retaliation, and hostile work environment are distinct, they can only be

---

[8] Moreover, to the extent that the Defendant raises a similar timing defense under Louisiana state law, the Court finds that its decision to address these claims on their merits is equally applicable.

exhausted when the facts presented on an EEOC complaint place a defendant on notice that the plaintiff seeks to assert a given claim. See, e.g., Frazier v. Sabine River Auth. of La., 509 F. App'x 370, 374 (5th Cir. 2013) ("Discrimination and retaliation claims are distinct, and the factual statement in [the plaintiff's] EEOC charge did not put [the defendant] on notice that [the plaintiff] was asserting a retaliation claim.").

In this case, the Defendant argues that the Plaintiff's EEOC complaint failed to make any reference to a hostile work environment claim. Besides not indicating on the EEOC charge form that she was seeking to raise such a claim, the Defendant reasons that the accusations articulated on the form "would [not] reasonably place [it] on notice that plaintiff would be pursuing a hostile work environment claim or that a hostile work environment claim could grow out of the initial charge of discrimination." Record Document 13-5, p. 3. Isolated incidents that took place over four years should not be expected to encompass a hostile work environment claim, according to the Defendant.

The Plaintiff retorts that unlike charges for sex discrimination or retaliation, the EEOC complaint form does not have a box to check to allege a hostile workplace. Instead, the Plaintiff asserts that the factual allegations on her EEOC form sufficiently placed the Defendant on notice that she was alleging such a claim, including her accusations that she was "regularly discriminated against in the assignment of shifts, assignment of duties, and overall treatment" and that her complaints about such treatment went unanswered and only resulted in "things get[ting] worse, not better." Record Document 18, p. 2. The Plaintiff believes that these initial assertions, along with the supplemental claims that she raised in her May 2013 letter to the Defendant, are enough to give notice to the Defendant and exhaust her administrative remedies.

As the EEOC complaint form lacks any separate box for the Plaintiff to indicate a hostile work environment claim, the issue here becomes whether such a claim could reasonably be expected to grow out of her documented charges of discrimination and retaliation. See Filer, 690 F.3d at 647.  A close reading of the EEOC complaint and the Plaintiff's letters to the Defendant reveal sweeping assertions without any clear articulation on the hostility of her workplace—in fact, neither the complaint nor the letters use the term "hostile work environment." Despite this, the Court must engage in a fact-intensive inquiry that goes beyond the EEOC complaint itself. See id. This inquiry requires an analysis of whether the Plaintiff's factual assertions reveal distinct instances of a hostile workplace, rather than only sex discrimination and/or retaliation. See, e.g., Frazier, 509 F. App'x at 374. Consequently, because in many ways this analysis goes to the merits of whether the Plaintiff has even established a hostile work environment claim, the Court defers ruling on this exhaustion issue and, instead, will address the merits of her claim below.

### b.    The Merits of the Claim

To sufficiently allege a prima facie claim for a hostile work environment under Title VII, a plaintiff must establish that he or she:

> (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on [sex]; (4) the harassment complained of affected a term, condition, or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 651 (5th Cir. 2012) (quoting Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002)). "A workplace environment is hostile when it is 'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" Alaniz v. Zamora-

Quezada, 591 F.3d 761, 771 (5th Cir. 2009) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "To be actionable, the work environment must be 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" Hernandez, 670 F.3d at 651 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)). Courts are instructed to consider the totality of the circumstances when analyzing such claims, including taking into account "(1) the frequency of the conduct; (2) its severity; (3) the degree to which the conduct is physically threatening or humiliating; and (4) the degree to which the conduct unreasonably interferes with an employee's work performance." Donaldson v. CDB Inc., 335 F. App'x 494, 501-02 (5th Cir. 2009).

In its motion, the Defendant, focusing on the fourth element of the prima facie case, argues that its alleged actions were neither severe nor pervasive enough to establish the Plaintiff's claim and/or to have affected a term, condition, or privilege of her employment. Not only did the "nine (9) alleged incidents occur[] over an extended period of four (4) years," but as the Defendant explains, the conduct was "not physically threatening, nor was it humiliating." Record Document 13-5, p. 4. In fact, the Defendant notes that the Plaintiff has not alleged any physical or sexual advances by other SPD officers and has "not allege[d] any offensive comments made over an extended period of time." Id. at pp. 3-4. As a matter of law, the Defendant asserts that these claims cannot support an allegation of a hostile workplace.

For the most part, the Plaintiff counters with the same accusations that she alleges form the basis of her sex discrimination and retaliation claims. Besides forcing her to retake the IAI exam without adequate study time, the Plaintiff principally argues that Duddy's

Page 11 of 35

favorable treatment of male officers within the CSIU supports her claim. When she complained about Duddy's favoritism, his actions only became worse, and he continued to speak "to [her] in a derogatory manner . . . ultimately caus[ing] her to have to take Xanax for a time." Record Document 18, pp. 23-24.

In light of this, the Court must agree with the Defendant here. Sufficiently alleging a hostile work environment charge is a formidable task, and it is one that the Plaintiff has failed to accomplish, even when the evidence is viewed in a light most favorable to her. The Plaintiff's factual allegations for this claim merely parallel her other claims, whether for sex discrimination or retaliation. While these separate legal claims may be supported by similar facts, the claims themselves are not conterminous. See Turner v. Novartis Pharm. Corp., 442 F. App'x 139, 141 (5th Cir. 2011) ("[The plaintiff] filed two EEOC charges, one alleging discrimination and one alleging retaliation. Neither of the two charges reasonably encompasses [the plaintiff's] new claim of a hostile work environment."). Treating an employee differently because of her sex or punishing her because she filed an EEOC complaint, without more, is not enough to make a workplace hostile. The actions by the Defendant may be unlawful, but as alleged, they do not establish automatically that the Plaintiff's workplace was so "permeated with discriminatory intimidation, ridicule, and insult, that [it was] sufficiently severe or pervasive [enough] to alter the conditions of [her] employment." See Alaniz, 591 F.3d at 771 (internal quotation marks and citation omitted). Rather, it is the Plaintiff's burden to plead facts that demonstrate a workplace is both objectively and subjectively hostile–a burden that her bare assertions fail to meet. See Hernandez, 670 F.3d at 651.

Indeed, after searching the Plaintiff's filings, the Court finds that, at best, she alleges

that Duddy spoke to her harshly and in a "derogatory manner," which contributed to her stress and taking medication. Nonetheless, she does not provide any examples of this derogatory language for the Court to consider or gauge its severity. Nor does the Plaintiff indicate how often she endured this degradation. In fact, it would not be enough for this Court to even presume that Duddy and other SPD officers made "boorish and offensive" remarks to the Plaintiff. See Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 874 (5th Cir. 1999) ("A recurring point in [Supreme Court] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (internal quotation marks omitted)). Without articulating these facts, it is difficult, if not impossible, for the Court to analyze this claim or even determine if one exists.[9]

The Plaintiff instead concludes her brief by explaining that she "is a member of a protected class, she suffered harassment due to her sex that affected her employment, and the [Defendant] was aware of it. She has established a prima facia [sic] case of hostile work environment and the defendant's motion must be denied." Record Document 18, p. 24.  The Court finds that the Plaintiff has utterly failed to present evidence that the Defendant's actions–whether through intimidation, ridicule, or insult–were so severe or pervasive that they impacted a condition of her employment. See Alaniz, 591 F.3d at 771. As such, without considering the other four elements of a hostile environment prima facie case, the Court hereby **GRANTS** the Defendant's motion on the Plaintiff's hostile work

---

[9] It is worth noting that despite the Fifth Circuit jurisprudence being replete with examples of hostile work environment claims, the Plaintiff failed to direct this Court to any case with similar facts on point, and the Court's own research has not found any support for her claim either.

environment claim.

### ii.    Sex Discrimination

The Court will next consider the Plaintiff's sex discrimination claim. When analyzing a claim for sex discrimination that is based on circumstantial evidence, as here, courts must do so under the tripartite framework set forth in <u>McDonald Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). According to this framework, "a plaintiff must first create a presumption of intentional discrimination by establishing a prima facie case. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." <u>Alvarado</u>, 492 F.3d at 611 (citation omitted) (explaining that the defendant's burden at this step is only one of production, not persuasion). Once the defendant satisfies its burden, the burden reverts back to the plaintiff to establish either "(1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." <u>Id.</u> To carry this final burden, "the plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates." <u>Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.</u>, 719 F.3d 356, 363 (5th Cir. 2013).

To establish a prima facie case of discrimination, the Plaintiff must demonstrate that "(1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) others similarly situated were more favorably treated." <u>Willis v. Coca Cola Enters., Inc.</u>, 445 F.3d 413, 420 (5th Cir. 2006) (internal citation and quotation marks omitted). The Defendant in this case contends that

the Plaintiff has failed to establish the third and fourth elements of this test, but it only truly offers direct argument on the fourth element, asserting that male SPD officers were not treated more favorably. In particular, the Defendant submits that both male and female officers were enlisted to work the October 2012 football game and that the male CSIU officers who did not take the IAI exam did not have the necessary prerequisites. At worst, the Defendant concedes, the "Affidavit of Cpl. Duddy shows that, with the exception of one occurrence necessitated by personal issues, plaintiff was treated the same as her male counterparts for comp time and, on one occasion, had her comp time restored by her supervisor." Record Document 13-5, p. 15. Her transfer to the graveyard shift similarly resulted from the fact that there were no open positions on daytime patrol.

The Plaintiff counters that she has established all of the elements of her claim. By being transferred out of the CSIU, the Plaintiff submits that she was effectively demoted when she lost the prestige of being a part of an "elite unit" that required special training and when she lost the ability to gain overtime pay by being on-call. The Plaintiff also contends that with regards to the IAI exam, male CSIU officers were treated more favorably: former and current male officers were not required to take the exam, even if they were qualified, but she was required to take the exam to maintain her position within the unit, despite the fact that "[p]assing the test was not a requirement of any policy or procedure of SPD when she took it or even before she was transferred." Record Document 18, pp. 19-20.

As an initial matter, the Court finds that the Plaintiff has clearly established the first three elements of a prima facie sex discrimination case. The Plaintiff is (1) a woman, (2) she was undisputedly performing her job with the CSIU effectively from May 2010 until she failed the IAI exam a second time, and (3) she suffered an adverse employment action

when she was transferred in May 2013. Despite the Defendant's conclusory assertion otherwise, the Plaintiff correctly argues that her transfer to the graveyard shift qualifies as an adverse employment action, as she lost her ability to collect overtime pay and the heightened prestige of working within the CSIU. A demotion qualifies as an adverse employment action, and demotions include transfers where a plaintiff is placed in a position that is objectively worse, including those positions with less prestige, less interesting work, less favorable working hours, and the like. See Alvarado, 492 F.3d at 612-13. Accordingly, it is clear that the Plaintiff's transfer from the CSIU to the graveyard shift of the patrol division satisfactorily establishes an adverse employment action in this context.[10]

Although the final element of this claim is onerous, the Plaintiff's opposition offers more than sufficient allegations and evidence to meet her burden of demonstrating that unequal treatment based on sex may have existed within the SPD and the CSIU. The Plaintiff asserts three types of less favorable treatment:  (1) Duddy's acts of favoritism; (2) implementation of the IAI policy; and (3) readvertisement of her position/failure to rehire her.   The Plaintiff's affidavit contains allegations and examples of favoritism and discrimination. While her accusations are countered by affidavits from Duddy and Deputy Chief of Police Duane Huddleston ("Huddleston"), these dueling affidavits only indicate that there are conflicting accounts of the Defendant's employment practices and/or Duddy's favoritism.  They do not affirmatively negate element four. As analyzed below, the Plaintiff provides substantial evidence that may show that the IAI exam policy was unequally

---

[10] The Plaintiff's brief addresses all of her claims for discrimination as a whole, as they stem from the events surrounding the IAI exam and its aftermath. As such, because the Court's analysis regarding pretext below adequately applies to all of these claims, the Court finds that the Plaintiff has preserved these factual allegations of discrimination for further litigation, and thus declines to separately address those claims..

implemented between female and male CSIU officers, if the policy was even established when the Plaintiff was transferred. The Plaintiff similarly provides evidence that calls into question the decision to readvertise and not rehire the Plaintiff when she twice received the highest applicant score for her recently vacated position. Taking this evidence in a light most favorable to her, there is no doubt that the Plaintiff has asserted a prima facie claim.

Next, the Court must analyze whether the Defendant has proffered "legitimate, nondiscriminatory reason[s] for its actions." Id. at 611. This burden is not a substantial one, as it is merely one of production–not persuasion–that does not involve credibility determinations. See id. Here, the affidavits from both Duddy and Huddleston articulate sex-neutral justifications for the Defendant's actions that are sufficient to overcome this minimal hurdle. In terms of his alleged favoritism, Duddy explained the medical and familial reasons why he made certain exceptions for CSIU members, including the Plaintiff, and how on-call schedules and other staffing decisions were made,[11] including for events like the October 2012 football game. Duddy also stated that with regard to the IAI exam, the decision was made to have the Plaintiff take the exam a second time without postponing it because the exam was about to be updated and she was already familiar with its current version. Most importantly, he represented that the policy decision that officers who could not pass the IAI exam after two attempts would be transferred out of the CSIU was made in 2012 and that this decision was communicated to all of the unit's personnel at the time. He ultimately concluded that the Plaintiff was "the only member of CSIU who . . . failed to pass the basic

---

[11] In particular, Duddy attests that his "decision[s] regarding who would perform a certain duty [were] made based on availability, skill level, experience, the need, manning, and other management factors." Record Document 13-2, pp. 2-3.

test within two attempts" and that this was the "primary reason for the transfer." Id. at p. 6.

Huddleston's affidavit echoes these proffered justifications, elaborating on why the Plaintiff's vacated position was both readvertised for new applicants and why she was not selected either time. After the position was reposted and additional officers applied, Huddleston "recommended to Chief Shaw that even though Corporal Stump received the highest average score, it was not logical to place her back in CSIU after she had so recently failed to pass the [IAI] exam on two attempts." Record Document 13-3, p. 6. He additionally stated that the Plaintiff's transfer to the graveyard shift was standard policy for any officer transferring out of a speciality unit, like the CSIU.[12] Thus, without addressing their persuasiveness, the Court must find that the Defendant has offered legitimate non-discriminatory reasons for all three categories of treatment that she deems to be less favorable.  The Defendant's proffered justifications are sufficient to overcome the burden for this second step.[13]

_____

[12] Priority to transfer to the day shift is given to officers who have already submitted requests for that assignment. So, according to Huddleston, any male officers who were transferred to the day shift prior to the Plaintiff had merely requested that transfer before her.

Huddleston also explains that while a male officer was inappropriately transferred to the day shift, he corrected this error by reassigning that officer to the evening shift and determined that this initial transfer was not made for a "discriminatory or harassing purpose." Record Document 13-3, pp. 2-3.

[13] It is worth noting that the Plaintiff states in her complaint that another female was discriminated against by Duddy when she applied for a position within the CSIU in July 2012. Despite the female being the highest scoring applicant according to the Plaintiff, Duddy announced that no applicant had scored high enough to take the position, and this process) ultimately, the Plaintiff alleges Duddy "refigured" the scores and awarded the position to a male. Record Document 1, p. 5. To the extent that she raises this allegation, the Plaintiff does not seem to address it in her opposition. See Record Document 18. On the other hand, the Defendant proffered a sex-neutral justification for this alleged discrimination. Although Duddy did give the highest marks to a female applicant, his score "was one of three scores used to compute [an average score for all the applicants, and this process] resulted in a male applicant having the highest average score." Record Document 13-2, p. 4. "[B]ecause none of the applicants scored at least 90 out of 120 points, or 75%," Duddy asserted that "the decision was made to re-advertise the position and lower the minimum passing overall score to 65%." Id. The Plaintiff offers no evidence to refute this explanation, and because the Defendant's burden is merely one of production at this step, the Court finds that the Defendant has met its burden here. As such, without any evidence indicating that this explanation is

The Court must now consider the third step of analysis and whether the Plaintiff has "put forward evidence rebutting each of the nondiscriminatory reasons the [Defendant] articulate[d]." See Haire, 719 F.3d at 363. Here, the Plaintiff contends the Defendant's justifications are merely pretext, which can be demonstrated by "showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence." Id.; see also Laxton v. Gap Inc., 333 F.3d 572, 579 (5th Cir. 2003) (reasoning an "explanation is false or unworthy of credence if it is not the real reason for the adverse employment action").

Viewing the evidence in a light most favorable to the Plaintiff, the Court concludes that she has produced sufficient evidence permitting a jury to disbelieve the Defendant's proffered reasons for its actions, insofar as the IAI exam and the Defendant's decision not to rehire her. See Laxton, 333 F.3d at 579. First, the Plaintiff highlighted a number of inconsistencies concerning the implementation and scope of the IAI exam policy. Although the Defendant contends that in 2012 there was an articulated policy that required all CSIU officers to pass the IAI exam after two attempts, the Plaintiff has offered convincing evidence to rebut this contention. According to a memorandum sent on January 7, 2013, Duddy informed Captain William Offer that in "the beginning of 2012, I had advised the members of the [CSIU] that one of our Goals and Objectives was to test and certify at least two Crime Scene Investigators as a [Certified Crime Scene Investigator]." Record Document 18-2, Ex. 15, p. 1. This implies that it was perhaps a "goal" to have a few CSIU

---

merely pretext, the Court must **GRANT** summary judgment in favor of the Defendant on this ground.

officers certified through the IAI exam in 2012, but it does not establish that there was a policy requiring all CSIU members to take and pass the exam after two attempts.

The Plaintiff additionally points the Court to the testimony of Mendels at the civil service hearing on September 11, 2013. Mendels confirmed the Plaintiff's account that it was only after Mendels and the Plaintiff registered to take the IAI exam for a second time that they were informed that "there was a good chance" that they would be transferred if they failed. Most damning of all is Duddy's testimony at this same civil service hearing, wherein he stated that he only received approval "a couple of months ago" to revise the CSIU Unit Policy Manual to require passage of the IAI exam. Record Document 18-2, Ex. 2, p. 13. He conceded that, in fact, there was no written policy requiring passage of the IAI exam before the Plaintiff was transferred in May 2013. Id.[14] Despite the Defendant's protestations to the contrary, this evidence undermines the Defendant's purported justification for transferring the Plaintiff and may imply that her transfer was motivated by her sex. See Haire, 719 F.3d at 363.

Furthermore, the Plaintiff offers circumstantial evidence to undermine the claim that there were no similarly situated males within the CSIU when the Plaintiff retook the IAI exam and was ultimately transferred. Relying upon Duddy's affidavit and testimony, the Defendant asserts that none of the "less experienced" male officers within the CSIU was qualified to take the IAI exam when the Plaintiff retook it in early 2013. Duddy testified that neither of the two male officers in question–Corporal John Madjerick ("Madjerick") and

---

[14] In support of this point, the Plaintiff submitted to the Court the entire Unit Policy Manual that was issued in May 2012 and was reviewed and approved again on May 1, 2013, and this version of the manual did not include the requirement that CSIU officers pass the IAI exam. See Record Document 18-2, Ex. 4. The Plaintiff was then notified only a few days after the manual was reviewed that she was being transferred. See Record Document 18-2, Ex. 13.

Officer Marcus Mitchell ("Mitchell")–had the necessary "one year [of experience] and . . . eighty hours of classroom training." Record Document 18-2, Ex. 2, p. 35. Yet, the organization administering the IAI exam only required "one (1) year in crime scene related activities [and] a minimum of 48 hours of Crime Scene Certification Board approved instruction in crime scene related courses within the last five (5) years" to take the exam in 2013. Record Document 18-2, Ex. 19, p. 1. Though this conflicting evidence is not sufficient alone, the Defendant conceded that both Madjerick and Mitchell had been in the CSIU for at least two years in January 2013.

Moreover, the Plaintiff argues that the "training records produced by the City in discovery clearly show that both officers [Madjerick and Mitchell] had way over 48 hours of training." Record Document 18, p. 8. This table of records provided by the Plaintiff clearly shows that Madjerick and Mitchell have each compiled hundreds of hours of instruction; however, these records lack dates. Without any dates, it is impossible for the Court to tell when either of the male officers would have been eligible to take the IAI exam.[15] Again, while this evidence taken together does not definitively establish that the Defendant's proffered justifications for its actions are mere pretext, it does cast doubt upon the reliability of these explanations. See Laxton, 333 F.3d at 578-79 ("Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of

---

[15] Despite the uncertainty, the January 2013 memorandum from Duddy explains that both Madjerick and Mitchell, as well as another male, would be eligible to take the IAI exam that year. This eligibility was confirmed by an e-mail on May 14, 2013, from Lieutenant Jimmy Muller, wherein he e-mailed notes to himself to document that he informed these same three males that they were eligible to take the exam and should schedule to take it in the fall.

discrimination even without further evidence of defendant's true motive.")[16]

With respect to the Plaintiff's readvertisement/refusal to rehire claim, the Plaintiff raises similar concerns with the Defendant's proffered reasons. The Plaintiff implies that the proffered explanation for readvertising and selecting a different candidate–that is, the Plaintiff's two previous failures–was only pretext, arguing instead that "the [Unit Policy Manual] was likely changed in response to her applying for the position and scoring highest in the process." Record Document 18, p. 23. Without considering her scores or whether the highest scoring applicant traditionally is offered a position within the CSIU, the Court must only note that the "Notice" to all the personnel concerning the new position did <u>not</u> include a requirement that the selected applicant pass the IAI exam within two attempts. <u>See</u> Record Document 18-2, Ex. 14. In fact, this notice did not even mention the IAI exam at all. While the Defendant may have hired a female officer for this position eventually and reasoned that it was "illogical" to rehire the Plaintiff after her previous failures, the conspicuous absence from this notice of any exam requirement permits the inference that passage of the exam was not mandated for this position at the time, further eroding the confidence one might have in the Defendant's sex-neutral justifications. <u>See</u> <u>Laxton</u>, 333 F.3d at 579.

Therefore, with respect to the IAI exam policy and the readvertisement/failure to rehire claim, the Court finds that the Plaintiff has established the necessary evidence to carry her burden at this third step of the analysis.

---

[16] The Court notes that while neither of the male officers had previously taken the IAI exam, so neither was facing a possible transfer if they failed, the uncertainty of whether these officers were being required to even initially take the exam when they were qualified raises substantial doubts as to the credence of the Defendant's justifications. <u>See</u> <u>Laxton</u>, 333 F.3d at 578-79.

To the contrary, the Plaintiff has failed to offer any cogent rebuttal to the Defendant's explanation of Duddy's alleged favoritism–that is, that Duddy based his decisions for comp time, assignment of duties, and the like on anything other than managerial concerns. Unlike her other claims of discrimination, the Plaintiff, at best, only offers her own affidavit as evidence to counter the justifications offered by the Defendant in this regard. Thus, for these early alleged acts of discrimination, the Court finds that the Plaintiff's claim for sex discrimination cannot survive because she has failed to put forward any additional evidence, other than that initially alleged, to rebuff the explanations articulated by the Defendant. See Haire, 719 F.3d at 363.

Consequently, to the extent that the Plaintiff's claim of sex discrimination is based on Duddy's early acts of favoritism or other supervisory decisions, the Defendant's motion for summary judgment is **GRANTED**. However, to the extent that the Plaintiff's claim is based on the circumstances surrounding the Plaintiff's transfer out of the CSIU and the decision not to rehire her for her vacated position, the Defendant's motion for summary judgment must be **DENIED**.

### iii.    Retaliation

The Defendant next seeks to dismiss the Plaintiff's Title VII claim of retaliation. Unlike her sex discrimination claim, the Plaintiff's assertions here focus entirely on her EEOC complaint, the actions of the Defendant regarding her second IAI exam, her eventual transfer, and the decision not to rehire her for her vacated CSIU position. Nevertheless, as with a discrimination claim, courts are instructed to analyze retaliation claims that are based on circumstantial evidence by using the burden-shifting framework

established in McDonald Douglas, which is set forth above in greater detail. See Haire, 719
F.3d at 367-69. This Court will thus begin with the first step of this framework–whether the
Plaintiff has established a prima facie case of retaliation.

To establish a case for retaliation, "the plaintiff must establish that: (1) he [or she]
participated in an activity protected by Title VII; (2) his [or her] employer took an adverse
employment action against him [or her]; and (3) a causal connection exists between the
protected activity and the adverse employment action." McCoy v. City of Shreveport, 492
F.3d 556-57 (5th Cir. 2007). For retaliation claims, context matters in determining whether
the employer undertook an adverse employment action; a plaintiff "must show that 'a
reasonable employee would have found the challenged action materially adverse, which
. . . means it well might have dissuaded a reasonable worker from making or supporting
a charge of discrimination.'" Davis v. Fort Bend Cnty., 765 F.3d 480, 490 (5th Cir. 2014)
(quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). This means
that the action must produce an injury or harm, as "petty slights, minor annoyances, and
simple lack of good manners" are normally not viable Title VII retaliation claims. White, 548
U.S. at 68.

With respect to the Plaintiff's prima facie case, the Defendant argues that the
Plaintiff has failed to establish the second and third elements of her claim. In terms of the
second element, the Defendant asserts that even assuming the April 2011 conference
concerning Duddy's favoritism was a protected activity, the later actions of Duddy after this
meeting, such as having the Plaintiff process vehicles or holding her to a high standard,
"cannot be said to rise to the level necessary to dissuade a reasonable employee not to
seek redress." Record Document 13-5, p. 6-7. More importantly, the Defendant submits

that all of its alleged actions comport with standard SPD polices, including requiring all CSIU officers to take the IAI exam, transferring the Plaintiff out of the unit after she failed this exam twice, and placing the Plaintiff on the graveyard shift for patrol. None of these actions, according to the Defendant, is of such quality that it could have dissuaded a reasonable officer from making a charge of discrimination or pursuing the matter further—both of which the Plaintiff did.

For the third element, the Defendant similarly alleges that "[a]ny temporal element is completely lacking" for causation, whether the asserted connection is between the April 2011 meeting that addressed Duddy's favoritism and his later alleged acts of harassment and discrimination or whether the connection is between the Plaintiff's EEOC complaint and her later transfer. Id. at p. 7.[17] While the Defendant concedes that the transfer occurred only four months after the Plaintiff lodged her EEOC complaint, it contends that the "mere apprehension that the two (2) events are causally related is insufficient to show the requisite causal connection." Id.

In opposition, the Plaintiff focuses exclusively on her EEOC complaint, the actions of the Defendant surrounding her second IAI exam, her transfer, and the decision not to rehire her for her recently vacated position. Due to her EEOC complaint in January 2013, the Plaintiff argues that the Defendant retaliated against her by not allowing her to

---

[17] While her complaint is, at best, unclear on the matter, the Plaintiff's opposition fails to address any issues relating to the April 2011 meeting, and it appears evident that she does not seek to offer these later alleged acts as a basis for a retaliation claim. As such, even assuming that she may have sought to ground a claim in Duddy's actions after this meeting, the Court cannot find that such a claim exists.

Furthermore, it is worth nothing that the Defendant also proffered legitimate justifications for its actions and those of Duddy in the wake of the April 2011 meeting, which the Plaintiff has failed to contest. See Record Document 13-5, pp. 5-9. Thus, as the Plaintiff offers no evidence indicating that these explanations are merely pretext, the Court would have found in the analysis of the third step that any claim for retaliation based on these early actions is without merit.

postpone her exam and compelling her "to take the test a second time without additional time to study." Record Document 18, pp. 20-21. Moreover, though the Plaintiff concedes that "Chief Shaw was the ultimate decision maker" on the subject, she claims that Duddy lied to Chief Shaw about her issues, influencing Chief Shaw's decision regarding the IAI exam and whether she should take it a second time. Id. She additionally asserts that her annual evaluation, which Duddy authored approximately three weeks after her transfer notice, was an act of retaliation. In the evaluation, the Plaintiff claims that Duddy remarked for the first time that the Plaintiff had a history of being late for work. Lastly, the Plaintiff contends that the Defendant retaliated against her by not returning her to the CSIU after she twice scored higher than any other applicant for the vacant position. The decision to readvertise the position, rather than award it to her initially, the Plaintiff submits, resulted from Duddy lying about her "sick leave issue" to his chain of command. Id. at p. 21; Record Document 18-2, Ex. 23, p. 1. The Plaintiff implies that these actions were taken in retaliation for her EEOC complaint and the subsequent letters that she sent to the Defendant asserting her rights.

As explained below, the Court finds that the evidence clearly indicates that the Plaintiff has sufficiently set forth a prima facie case for retaliation. At the onset, the Court notes that it is undisputed that the filing of the EEOC complaint in January 2013 was a protected activity. See Grimes v. Tex. Dep't of Mental Health & Mental Retardation, 102 F.3d 137, 140 (5th Cir. 1996).

The Court next considers whether the Defendant took an adverse employment action against the Plaintiff. This analysis is different than that employed for a sex discrimination claim, and the Plaintiff here is required to show that the alleged actions were

Page 26 of 35

"materially adverse." See White, 548 U.S. at 67-69; Davis, 765 F.3d at 490-91. When taken together, the Plaintiff's allegations easily rise to the level of actions that might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." See Davis, 765 F.3d at 490; see also Haire, 719 F.3d at 367-68. While the purported actions did not dissuade the Plaintiff from ultimately pursuing her Title VII claims, they "well might have dissuaded a reasonable worker." See Davis, 765 F.3d at 490. Furthermore, the adverse impact of transferring an officer from a prestigious unit to the graveyard shift of the patrol division or removing an officer's ability to earn overtime pay must be viewed in context. See White, 548 U.S. at 68 (explaining the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances" and a "schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children"). Thus, when viewed in context, the Court cannot doubt the materially adverse impact that these alleged actions, as well as the others, had on the Plaintiff, especially as a single mother.

It is similarly undisputed that the Defendant twice decided against rehiring the Plaintiff for her vacated position in the months after she filed her EEOC complaint, despite the Plaintiff having the highest applicant score both times. The Plaintiff implies that these later hiring decisions were based, at least partially, on the negative evaluation that Duddy authored and her purported history of taking sick leave–both of which were revealed by Duddy after her EEOC complaint. Unlike adverse employment actions in the discrimination context, which must relate to "ultimate employment decisions," adverse actions in this context "require a closer look." See Haire, 719 F.3d at 368 (quoting McCoy, 492 F.3d at 559-60). Therefore, after this close examination, the Court finds that the Plaintiff has

satisfied this second element of a retaliation claim.[18]

The Plaintiff has sufficiently provided evidence to demonstrate the third element of her claim as well. While it was roughly four months between the Plaintiff's EEOC complaint and her transfer, this time period is not too attenuated to establish the causal connection between the two incidents. See id. (finding that three months between a plaintiff's protected activity and an adverse employment action was enough to satisfy this element, especially when coupled with a gradual reduction in the plaintiff's duties). In spite of the Defendant's assertions to the contrary, at this step of the analysis, it may be sufficient for causation purposes to demonstrate only temporal proximity. See Roberts v. Lubrizol Corp., 582 F. App'x 455, 461 (5th Cir. 2014) (explaining that while alone it may be "insufficient to establish pretext," "temporal proximity may be sufficient to establish the causation element of a plaintiff's prima facie case for retaliation"). This temporal connection applies with equal force to the allegations concerning the Defendant's later actions as well–such as the decisions to readvertise and not select the Plaintiff for her vacated position and Duddy's annual evaluation–especially in light of the two letters regarding continued discrimination

---

[18] The Plaintiff additionally alleges that after she filed this instant suit in November 2013, the Defendant retaliated against her sometime in 2014 by attempting to transfer her out of her new position as a school resource officer. While she took an extended leave of absence due to a medical condition, the Plaintiff was ultimately not transferred out of her new position and was able to return in this instance as a school resource officer at the end of her absence. Even viewing the events surrounding this allegation in a light most favorable to her and in the context of her other allegations, the Court is unsure how this was an adverse employment action. If anything, it seems to be a minor annoyance associated with the procedures regarding extended medical leave, as the Defendant notes in its reply. See White, 548 U.S. at 68. As such, without addressing the procedural issue of whether the Plaintiff should have amended her complaint originally, the Court finds that this accusation cannot sustain a claim for retaliation.

In light of this allegation, as well as many of the others, the Court must state that the scatter-shot approach to briefing employed by the Plaintiff not only makes it difficult for the Court to comprehend clearly the Plaintiff's accusations, but it taxes the Court's patience as well. The lack of clarity and linear discussion in the Plaintiff's brief has made an already factually complex case nearly inscrutable.

against the Plaintiff that were provided to the Defendant after her EEOC complaint. Given the temporal proximity and the employment changes experienced by the Plaintiff during this period, the Court finds that she has successfully pled a case for retaliation.

The Court next briefly examines the legitimate, nonretaliatory justifications proffered by the Defendant for its actions. As with a discrimination claim, a defendant's burden at this step is merely one of production–not persuasion–and courts are not to make any credibility determinations. See McCoy, 492 F.3d at 557. For the most part, the Defendant offers the same explanations for its allegedly retaliatory actions as it did to rebut the Plaintiff's sex discrimination claim. Relying again primarily on the affidavits of Duddy and Huddleston, the bulk of the Defendant's brief centers on its legitimate exam policy, the Plaintiff's transfer and assignment to the graveyard shift, Duddy's evaluation of her, and the decision to select another female officer after readvertising the Plaintiff's vacated position. The explanations for why these actions were not retaliatory generally echo those detailed above for the discrimination claim. For instance, among other justifications, the Defendant explains that its decision to repost the Plaintiff's vacated position was based on the low number of initial applicants and "reservations" Duddy and Huddleston had about each of them, including the Plaintiff.

Of particular note, the Defendant represents that the statements in the Plaintiff's annual evaluation, which was submitted four months after her EEOC complaint, were neither discriminatory nor retaliatory because they were true. Besides the "uncontroverted fact" that she twice failed the IAI exam, the Defendant submits that the Plaintiff "called in late on a regular basis, many times due to appointments not disclosed previously to her supervisors." Record Document 13-5, p. 11. Without passing judgment on the credibility

of these stated justifications, the Court finds that the Defendant has again carried its burden of producing legitimate, nonretaliatory reasons for its actions.

The Court now addresses the third step of analysis. As with her discrimination claim, the Plaintiff solely argues that the Defendant's justifications are pretext.[19] "An employee establishes pretext by showing that the adverse action would not have occurred 'but for' the employer's retaliatory reason for the action." Hague v. Univ. of Tex. Health Sci. Ctr., 560 F. App'x 328, 333 (5th Cir. 2014) (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013)). "[T]o avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." Id. (quoting Long v. Eastfield Coll., 88 F.3d 300, 308 (5th Cir. 1996)). Like a discrimination claim, a plaintiff must rebut each of the explanations proffered by a defendant. See Staten v. New Palace Casino, LLC, 187 F. App'x 350, 357-58 (5th Cir. 2006). The standard for showing pretext is the same for retaliation claims as it is for discrimination claims as well–"[e]vidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination [or retaliation] even without further evidence of the defendant's true motive." Id. (quoting Laxton, 333 F.3d at 578)) (alterations in original).

As analyzed in much greater detail above, the Court has already found that the Plaintiff has met her burden of providing evidence that demonstrates that a reasonable

_____

[19] In fact, the Plaintiff's arguments are exactly the same as those for her sex discrimination claim, because her brief does not differentiate between these two separate claims in terms of rebutting the pretextual nature of the Defendant's explanations. See Record Document 18, pp. 22-23.

juror could infer that the Defendant's explanations for its actions relating to the IAI exam, her transfer, and the decision not to rehire her are all worthy of disbelief. See id. at 578-79. Indeed, because both the Plaintiff's and Defendant's arguments are nearly identical to those raised for the sex discrimination claim, the Court finds that its prior analysis of pretext for the discrimination claim must apply with equal force to the Plaintiff's retaliation claim. See Haire, 719 F.3d at 369 (reversing a grant of summary judgment and finding that for "the same reasons outlined . . . with regard to discrimination, we hold that [the plaintiff] has met her burden of showing a conflict in substantial and relevant evidence [with regards to pretext for a retaliation claim], as [the parties] make competing allegations, and credibility determinations are best left for trial"). Moreover, disparate treatment of similarly situated employees may also be sufficient to permit a jury to find a retaliatory motive and pretext, and as outlined above, the Plaintiff's evidence raises a substantial question on this issue as well. See Roberts, 582 F. App'x at 461.

Finally, the Court notes that the Plaintiff has provided three of her previous annual evaluations, none of which contains any mention of or issues associated with her attendance or sick leave. See Record Document 18-2, Ex. 7. Viewing this evidence most favorably to her, these records tend to belie the assertion that the Plaintiff "regularly" was late for work or had attendance issues prior to when she filed her EEOC complaint. See also Record Document 18-2, Ex. 24 (documenting the Plaintiff's work hours for 2012).

For these reasons, the Defendant's Motion for Summary Judgment with regard to the Plaintiff's retaliation claim is **DENIED**.

**B.      Intentional Infliction of Emotional Distress**

The Plaintiff alleges a state law cause of action for the Defendant's intentional infliction of emotional distress ("IIED"). To establish such a claim, a plaintiff must demonstrate:

> (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his [or her] conduct.

Rice v. ReliaStar Life Ins. Co., 770 F.3d 1122, 1137 (5th Cir. 2014) (quoting White v. Monsanto Co., 585 So. 2d 1205, 1209 (La. 1991)). "Not every verbal encounter may be converted into a tort," and the "conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." White, 585 So. 2d at 1209. In the workplace, however, a plaintiff's status as an employee "may entitle [the plaintiff] to a greater degree of protection from insult and outrage by a supervisor with authority over him [or her] than if he [or she] were a stranger." Id. Nevertheless, because a pressure-filled workplace environment is likely to cause some degree of mental anguish, "disciplinary action and conflict in [such an environment] is not ordinarily actionable," and an accusation of IIED in this context has "usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time." Id.; see also Harper v. Boise Paper Holdings, LLC, 575 F. App'x 261, 265 (5th Cir. 2014).

For this claim, the parties provide very little, if any, briefing. The Defendant argues that the Plaintiff has failed to offer any evidence to establish that its officers acted intentionally or that its alleged actions were "utterly intolerable." Record Document 13-5,

pp. 17-18.[20] The Plaintiff, on the other hand, offers only a passing reference to this claim in her complaint and fails to address it at all in her opposition to the Defendant's motion. At best, the Plaintiff's EEOC complaint explains that "Sgt. Duddy's mistreatment of me and favoritism of male officers has caused my blood pressure to increase and causes me stress on a daily basis as I am not sure what he is going to find to mistreat me about." Record Document 13-1, p. 3.[21]

Here, even affording the Plaintiff a greater degree of deference, given the context, and viewing the evidence in a light most favorable to her, the Court must nonetheless grant summary judgment on this claim. The Plaintiff provides no argument or evidence for why the Defendant's actions were so "extreme and outrageous" as to cause her emotional distress.  In fact, she offers nothing at all other than mentioning the claim in her complaint. While the Court is sympathetic to the stress and anxiety the Plaintiff purportedly suffered, playing favorites and treating an employee unfairly because she is a woman, without more, does not automatically establish an IIED claim. See Wilson v. Monarch Paper Co., 939 F.2d 1138, 1143 (5th Cir. 1991) ("[I]t is not unusual for an employer, instead of directly discharging an employee, to create unpleasant and onerous work conditions designed to force an employee to quit . . . . [A]lthough this sort of conduct often rises to the level of illegality, except in the most unusual cases it is not the sort of conduct, as deplorable as it may sometimes be, that constitutes 'extreme and outrageous' conduct.") Only in the

---

[20] The Defendant also argues that "any actions for which plaintiff seeks recovery in tort which occurred prior to November 12, 2012 have prescribed," pursuant to Louisiana Civil Code Article 3492. Record Document 13-5, p. 2. However, because the Court can dispose of this claim on its merits, the Court declines to address the Defendant's prescription argument.

[21] Furthermore, in reference to her other claims, the Plaintiff notes that she also took Xanax for an unknown period of time due to her alleged mistreatment.

"most unusual cases" will unpleasant working environments support an IIED claim, and the Plaintiff has offered no support for why any of the Defendant's alleged actions were so egregious as to "go beyond all possible bounds of decency." <u>See</u> <u>Wilson</u>, 939 F.2d at 1143.

Moreover, even assuming Duddy periodically subjected the Plaintiff to "derogatory language," this is insufficient, as "[l]iability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." <u>White</u>, 585 So. 2d at 1209; <u>Stewart v. Parish of Jefferson</u>, 668 So. 2d 1292, 1294 (La. Ct. App. 5th 1996) (finding that the alleged conduct was insufficiently outrageous to support a claim when the plaintiff's supervisor harassed the plaintiff for two years, inquired about the plaintiff's personal life, increased the plaintiff's workload, and pushed the plaintiff into taking a demotion, which ultimately resulted in the plaintiff's termination).

Thus, the Court holds that even when viewed in a light most favorable to her, the Plaintiff has failed to create a genuine factual issue as to the "extreme and outrageous" nature of the Defendant's purported conduct. Accordingly, the Defendant's Motion for Summary Judgment is **GRANTED** with regards to the Plaintiff's IIED claim.

## IV.    Conclusion

For the foregoing reasons,

**IT IS ORDERED** that the Motion for Summary Judgment submitted by the Defendant [Record Document 13] is hereby **GRANTED in part** and **DENIED in part**.  The

Court makes the following rulings:

(1)     The Defendant's motion for summary judgment regarding the Plaintiff's hostile work environment claim is **GRANTED**;

(2)     The Defendant's motion for summary judgment regarding the Plaintiff's sex discrimination claim founded upon Duddy's early acts of favoritism and other supervisory decisions is **GRANTED**;

(3)     The Defendant's motion for summary judgment regarding the Plaintiff's sex discrimination claim based on the circumstances surrounding the Plaintiff's transfer out of CSIU and the decision not to rehire her is **DENIED**;

(4)     The Defendant's motion for summary judgment regarding the Plaintiff's retaliation claim is **DENIED**; and

(5)     The Defendant's motion for summary judgment regarding the Plaintiff's IIED claim is **GRANTED**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, on this 30th day of September, 2015.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE